**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action |
| v. | No. 17-461-1 |
| MARK STAATS | |

**MEMORANDUM**

We are in the midst of the worst global health crisis of the past 100 years.[1]

Over eight months after the United States declared COVID-19 a national

emergency, the virus continues to paralyze the country and the world.[2] There are

over 58 million confirmed cases of COVID-19 worldwide, and over 12.2 million

confirmed cases in the United States.[3] The death toll in the United States has

reached over 250,000 people.[4] While a vaccine may be on the horizon, in the

meantime, the virus shows no signs of slowing its spread. Though the virus

presents a danger to all people, those in prisons and jails face an increased risk of

---

[1] *See* Marie Rosenthal, *Fauci: Covid-19 Worst Pandemic in 100 Years*, Infectious Disease Special Edition (Oct. 21, 2020), https://www.idse.net/Covid-19/Article/10-20/Fauci-COVID-19-Worst-Pandemic-in-100-Years/60937.

[2] *See* President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, White House (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

[3] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University of Medicine Coronavirus Resource Center (accessed Nov. 22, 2020), https://coronavirus.jhu.edu/map.html.

[4] *Id.*

COVID-19.[5] And people with pre-existing medical conditions in prison—like Petitioner Mark Staats—face a particularly high risk of suffering severe health effects or dying from COVID-19.

Mr. Staats is incarcerated at FCI Fort Dix, a low security federal correctional institution on Joint Base McGuire-Dix-Lakehurst, New Jersey. He is 47 years old and suffers from asthma, hyperlipidemia, post-traumatic stress disorder, depression, migraines, has a history of smoking, and is overweight. Resp. in Opp'n to Mot. Reduce Sentence, Ex. A, 190-91, ECF No. 62 [hereinafter "Resp."]. He recently suffered a fainting spell that caused a laceration to his head requiring staples. *Id.* at 157, 172, 190. Including good time credit he has earned, Mr. Staats has completed 45 months of a 60-month mandatory-minimum sentence for receipt and possession of child pornography. *See* Resp. at 3. He is about a year away from his projected release date. *Id.* Mr. Staats is only months away from becoming eligible for home confinement. Def. Mot. at 3.[6] The instant offense is Mr. Staats's

---

[5] *See* Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, NY Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html (describing the unique challenges faced by incarcerated people and staff to combat COVID-19 such as lack of cleaning supplies and inability to social distance).

[6] Mr. Staats states that he is eligible for home confinement as "early as March 2021." Def. Mot. at 3. The First Step Act modified 18 U.S.C. § 3621(c)(1) and authorizes the Bureau of Prisons to maximize time spent on home confinement. Per the First Step Act, an incarcerated person may be placed on home confinement for the shorter of 10 percent of the sentence or six months. *See Home Confinement under the First Step Act*, Federal Bureau of Prisons (Apr. 4, 2019), https://www.bop.gov/policy/om/001-2019.pdf/. Because Mr. Staats is approaching the end of his sentence, he will become eligible for home confinement in a matter of months.

first contact with the criminal justice system—his record is devoid of any other convictions or arrests. Presentence Investigation Report [hereinafter "PSR"] ¶¶ 32-35.

On May 8, 2018, Mr. Staats pled guilty and began serving his 60-month sentence.[7] He has served about 75 percent of his sentence, committed no disciplinary infractions, and has a projected release date of November 27, 2021. *See* U.S. Probation Office Mem. (November 17, 2020) [hereinafter "Probation Mem."]. He moves, *pro se*, for a reduction of his prison sentence and immediate release under the "compassionate release" statute, 18 U.S.C. § 3582(c)(1)(A)[8]. He argues that "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. §3582(c)(1)(A)(i).

For Mr. Staats, nothing could be more extraordinary and compelling than this pandemic. Of his long list of ailments, Mr. Staats's history as a smoker, his asthma, and his weight present the most concern. "Smoking is associated with substantially higher risk of COVID-19 progression."[9] According to a study conducted by researchers at the University of California, San Francisco, smokers

---

[7] Mr. Staats's sentence also includes 5 years of supervised release.

[8] The Court appointed counsel for Mr. Staats on October 29, 2020. *See* ECF No. 56. Appointed counsel elected not to file a supplemental brief.

[9] Elizabeth Fernandez, *Smoking Nearly Doubles the Rate of COVID-19 Progression*, UCSF (May 12, 2020), https://www.ucsf.edu/news/2020/05/417411/smoking-nearly-doubles-rate-covid-19-progression (quoting Stanton A. Glantz, PhD, on the relationship between smoking and COVID-19).

have nearly double the odds of experiencing progression of COVID-19 than non-smokers.[10] Further, Mr. Staats has a Body Mass Index of 26.0-26.9, making him overweight, and requires daily use of an inhaler to treat his asthma. Resp., Ex. A, 84, 191. The Centers for Disease Control (CDC) consider both of these conditions to be potential risk factors for severe illness from COVID-19.[11]

These statistics become even more concerning when considered in the prison context. Prisons are tinderboxes for infectious disease, and at Fort Dix, the match has already been lit. Fort Dix is experiencing an uncontrolled outbreak of COVID-19. In early October, the Bureau of Prisons (BOP) reported zero cases of the virus at Fort Dix[12]. As of November 23, 2020, 246 incarcerated people and 18 staff have contracted the disease.[13] Fort Dix now has the second-highest number of positive

---

[10] Roengrudee Patanavanich MD, LLM, PhD, et al., *Smoking is Associated with COVID-19 Progression: A Meta-analysis*, Nicotine & Tobacco Research (May 6, 2020), https://academic.oup.com/ntr/article/22/9/1653/5835834.

[11] *See* Coronavirus Disease 2019 (COVID-19), Centers for Disease Controls and Prevention (accessed Nov. 19, 2020, updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[12] *See* Joe Atmonavage, *Lawmakers have 'grave concerns' over how officials are handling COVID-19 outbreak at N.J. prison*, NJ.com (Nov. 9, 2020), https://www.nj.com/news/2020/11/lawmakers-have-grave-concerns-over-how-officials-are-handling-covid-19-outbreak-at-nj-prison.html (describing the rise in positive cases at Fort Dix, where there were "no cases of the virus on October 9" and now there are over 200 positive cases).

[13] *COVID-19 Cases*, Federal Bureau of Prisons (accessed Nov. 23, 2020), https://www.bop.gov/coronavirus/index.jsp.

cases of all BOP facilities.[14] Luckily, no one has died yet.[15] Mr. Staats's unit has

been devastated by the virus, with nearly every person testing positive. Resp. at 10.

Indeed, Mr. Staats tested positive for COVID-19 on October 25, 2020. *Id.* While

the government argues that the BOP's efforts towards the virus have been

"aggressive," they have clearly not protected Mr. Staats and the 245 other

prisoners and 18 staff who contracted COVID-19. Resp. at 9.

        After reviewing the law and evaluating all the evidence that has been

presented, I conclude that I will grant "compassionate release."

## I.    DISCUSSION

        18 U.S.C. § 3852(c)(1)(A) allows a court to reduce a prisoner's sentence if

the court finds that (1) "extraordinary and compelling reasons" warrant a

reduction, (2) the reduction would be "consistent with applicable policy statements

issued by the Sentencing Commission," and (3) the applicable sentencing factors

under § 3553(a) warrant a reduction.[16]  Congress has not defined the term

---

[14] *Id.*

[15] *Id.*

[16] Mr. Staats's motion is properly before the Court because he has complied with § 3582(c)(1)(A)'s 30-day lapse provision. *See* 18 U.S.C. § 3582(c)(1)(A) (providing that a prisoner can file a motion with the court upon the "lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility"). He submitted a petition for compassionate release to the warden of FCI Fort Dix on July 27, 2020, and never received a response. Def. Mot. at 12. He filed the instant motion on October 29, 2020. The government confirmed that the warden of Fort Dix did not provide a response to Mr. Staats's request for release. Resp. at 3-4, n.1. Because 30 days has lapsed from the Warden's receipt of the request, Mr. Staats's motion is timely and properly before the Court.

"extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term.  The policy statement lists three specific examples of "extraordinary and compelling reasons," as well as a "catchall" provision if the Director of the Bureau of Prisons ("BOP") determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." U.S.S.G. § 1B1.13, cmt. n.1(A)-(D). In addition, the policy statement provides that a sentence reduction may only be granted if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  *Id.* § 1B1.13(2). Furthermore, the policy statement mirrors the language of § 3582(c)(1)(A) and requires a court to consider the applicable § 3553(a) factors.

Although § 3582(c)(1)(A) requires a reduction in sentence to be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded, in light of amendment to § 3582(c)(1)(A) by the First Step Act of 2018, and the Sentencing Commission's failure to "update[] its policy statement to account for the changes imposed by the First Step Act," that "the policy statement is now clearly outdated." *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Accordingly, while "the policy statement may provide 'helpful guidance' [it] does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist

under § 3582(c)(1)(A)(i)."[17] *Id.* at *4. I consider (1) whether "extraordinary and compelling reasons" exist to reduce Mr. Staats's sentence based on the enumerated criteria in the policy statement and an independent assessment; (2) whether Mr. Staats is a danger to the community under § 3142(g); and (3) whether the § 3553(a) factors support a sentence reduction.

### A. Extraordinary and Compelling Reasons Exist

Mr. Staats's circumstances—particularly the outbreak of COVID-19 at Fort Dix, his underlying medical conditions, and proximity to his release date—present "extraordinary and compelling reasons" to reduce his sentence.

In the policy statement, the Sentencing Commission provides three specific circumstances that qualify as "extraordinary and compelling reasons" that warrant a sentence reduction: (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish[]" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is at least 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the caregiver for the inmate's minor children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's

---

[17] For an in-depth discussion of the interplay between the amendment to § 3582(c)(1)(a) and the policy statement, which explains this Court's reasoning here, see *Rodriguez*, 2020 WL 1627331, at *2-6.

only caregiver.  U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). The policy statement also includes a catchall provision that gives the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the other three categories.  *Id.* cmt. n.1(D).

Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." *Extraordinary*, Black's Law Dictionary (11th ed. 2019).  It defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." *Compelling Need*, Black's Law Dictionary (11th ed. 2019).

Mr. Staats's health conditions render him vulnerable to COVID-19, and given the severe and worsening outbreak at Fort Dix, prison is a particularly dangerous place for him at this moment. In addition, he has served the majority of his sentence and has maintained a perfect disciplinary record while incarcerated. None of these reasons *alone* is extraordinary and compelling. Taken together, however, they constitute reasons for reducing his sentence "[b]eyond what is usual, customary, regular, or common," and reasons "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling Need*, Black's Law Dictionary (11th ed. 2019).

8

As previously noted, Mr. Staats suffers from a number of underlying health conditions: asthma, hyperlipidemia, post-traumatic stress disorder, depression, and migraines. He also has a history of smoking and prior to his incarceration smoked one pack of cigarettes a day for six years. Resp., Ex A, 2. His BMI indicates he is overweight. *Id.* at 191. As described above, his history of smoking is most likely to place him at high risk of severe illness or death from COVID-19. The CDC lists smoking as a condition that renders adults of any age "at [an] increased risk of severe illness from the virus that causes COVID-19."[18] His asthma also presents a potential risk. Mr. Staats is currently prescribed two different inhalers to treat his asthma. Resp., Ex. A, 194. He uses a Mometasone Furoate[19] inhaler daily and an Albuterol inhaler when necessary to treat asthma attacks. *Id.* One study of COVID-19 in the United Kingdom found that one of the leading comorbidities in deaths from the virus was asthma, with an even higher rate for those who use an oral corticosteroid, like Mometasone Furoate.[20]

---

[18] *See* Coronavirus Disease 2019 (COVID-19), *supra* note 10.

[19] Mometasone Furoate is a type of medicine known as a corticosteroid used to improve breathing and decrease the severity of asthma attacks. *See* Drugs and Supplements Mometasone (Inhalation Route), Mayo Clinic (Jul. 1, 2020), https://www.mayoclinic.org/drugs-supplements/mometasone-inhalation-route/description/drg-20067282.

[20] The OpenSAFELY Collaborative et al., *Open SAFELY: factors associated with COVID-19-related hospital deaths in the linked electronic health records of 17 million adult NHS patients*, (May 7, 2020), https://www.medrxiv.org/content/10.1101/2020.05.06.20092999v1.full.pdf.

In addition to Mr. Staats's health conditions that place him at increased risk of severe negative outcomes from COVID-19, Mr. Staats's age is a risk factor. Mr. Staats is 47 years old. The CDC has consistently found over the course of the pandemic that death counts rise with each decade of age.[21] In fact, CDC statistics updated as recently as November 18, 2020, indicate that the death rate for people in the 45-54 age bracket is nearly three times the death rate for people in the 35-44 age bracket.[22]

While Mr. Staats is asymptomatic and may fully recover from COVID-19, he is still at risk for re-infection. At the beginning of the pandemic, the World Health Organization reported that "there is currently no evidence that people who recovered from COVID-19 and have antibodies are protected from a second infection."[23] Months later, there is still no scientific consensus on the dangers of

---

[21] *See Weekly Updates by Select Demographic and Geographic Characteristics: Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control & Prevention, Age & Sex, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed Nov. 20, 2020).

[22] *Id.*

[23] *'Immunity passports' in the context of COVID-19*, World Health Organization (Apr. 24, 2020) https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19.

reinfection.[24] The government concedes this point. Resp. at 16.[25] Cases of

reinfection have been documented in Brazil, Sweden, Mexico, the Netherlands,

and Qatar.[26] As the virus continues its spread, scientists believe cases of reinfection

"could become more common over the next couple of months as early cases begin

to lose their immunity."[27] Some cases of reinfection have been far more severe

than the initial infection.[28] Because Mr. Staats's underlying conditions could mean

that a second infection may be more severe or even fatal, the fact he has tested

positive for the virus is not a reason to deny his release. *See United States v.*

*Babbitt*, 2020 WL 6153608, at *8 (E.D. Pa. Oct. 21, 2020) (Savage, J.) (noting the

risk of re-infection when granting compassionate release for child pornography

offender who had previously tested positive for COVID-19 while in prison).

     Prisons are ill-equipped to prevent the spread of COVID-19. Many of the

recommended measures to prevent infection are impossible or unfeasible in prison.

Public health experts recommend containing the virus through measures such as

social distancing, frequently disinfecting shared surfaces, and frequently washing

---

[24] *See* Jop de Vrieze, *More people are getting COVID-19 twice, suggesting immunity wanes quickly in some*, Science (Nov. 18, 2020), https://www.sciencemag.org/news/2020/11/more-people-are-getting-covid-19-twice-suggesting-immunity-wanes-quickly-some.

[25] "We cannot say that the defendant no longer faces any risk, given that there is not yet a scientific consensus on reinfection." Resp. at 16.

[26] *See* de Vrieze, *supra* note 21.

[27] *Id.*

[28] *Id.* ("Not all reinfections seen so far are milder.").

hands or using hand sanitizer.[29] Joseph J. Amon, an infectious disease

epidemiologist and Director of Global Health and Clinical Professor in the

department of Community Health and Prevention at the Drexel Dornsife School of

Public Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious spread because
> of conditions of crowding, the proportion of vulnerable people
> detained, and often scant medical care. People live in close quarters and
> are also subject to security measures which prohibit successful "social
> distancing" that is needed to effectively prevent the spread of COVID-
> 19. Toilets, sinks, and showers are shared, without disinfection between
> use. Food preparation and food service is communal, with little
> opportunity for surface disinfection. The crowded conditions, in both
> sleeping areas and social areas, and the shared objects (bathrooms,
> sinks, etc.) will facilitate transmission.[30]

The government contends that the BOP "has taken significant measures to

protect the health of the inmates in its charge." Resp. at 5. As part of these

measures, the government represents that the "BOP has severely limited the

movement of inmates and detainees among its facilities." *Id.* at 6. Fort Dix,

however, appears to be an exception. In October, the BOP began transferring

---

[29] *See, e.g.*, *How to Protect Yourself & Others*, Centers for Disease Control & Prevention
(accessed Nov. 19, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/prevention.html; Dr. Asaf Bitton, *Social distancing in the coronavirus pandemic —
maintaining public health by staying apart*, Boston Globe (Mar. 14, 2020),
https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-pandemic-
maintaining-public-health-by-staying-apart/.

[30] *Declaration of Joseph J. Amon, Ph.D. MSPH* ¶ 20, Def. Reply Br. Ex. A, *United States v.
Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), ECF No. 134-
1, also available at
https://www.aclupa.org/sites/default/files/field_documents/dr._amon_declaration_march_30_202
0.pdf.

prisoners from FCI Elkton, where nearly 1,000 prisoners tested positive and nine died, to Fort Dix.[31] In response to the transfers, Senator Bob Menendez, Senator Cory Booker, and eight other New Jersey lawmakers, expressed "grave concerns" over the "escalating crisis" at Fort Dix.[32] In a letter sent to BOP Director Michael Carvajal, they wrote "it is clear that [the] BOP does not have an effective plan to ensure COVID-19 positive incarcerated individuals are not transferred between facilities."[33] Recognizing the urgency of the situation, they underscored the danger the outbreak presents: "All incarcerated individuals and staff at FCI Fort Dix and the surrounding communities are now at increased risk for contracting COVID-19, with potentially deadly consequences."[34] Simply put, Fort Dix has shown that it cannot contain the virus. The "escalating crisis" has become a public health threat

---

[31] *See* Stephanie Melamed, *COVID-19 outbreak infecting hundreds at Fort Dix is 'escalating crisis,' N.J. Senators warn*, The Philadelphia Inquirer (Nov. 10, 2020), https://www.inquirer.com/news/fci-fort-dix-coronavirus-covid-outbreak-transfers-elkton-cory-booker-bob-menendez-20201110.html; *see also COVID-19 Cases*, *supra* note 12; *FCI Elkton*, Federal Bureau of Prisons (accessed Nov. 20, 2020), https://www.bop.gov/locations/institutions/elk/. *But see* George Woolston, *FCI Fort Dix officials deny COVID outbreak began with inmate transfers*, Burlington County Times (Nov. 19, 2020), https://www.burlingtoncountytimes.com/story/news/2020/11/19/fci-fort-dix-officials-deny-covid-outbreak-began-inmate-transfers/6344172002/ (reporting that Associate Warden Kimberly Kodger claimed outbreak was not caused by transfers from FCI Elkton because all transferees were immediately quarantined upon arrival).

[32] *Menendez, Booker Lead Delegation Call To Prevent COVID-19 Spread At Fort Dix*, Bob Menendez, Senator for New Jersey (Nov. 9, 2020), https://www.menendez.senate.gov/newsroom/press/menendez-booker-lead-delegation-call-to-prevent-covid-19-spread-at-fort-dix.

[33] *Id.*

[34] *Id.*

to staff, the surrounding community, and of course, incarcerated people like Mr. Staats.

The BOP has not and cannot adequately protect Mr. Staats from infection. Mr. Staats's physical vulnerabilities in light of this pandemic constitute reasons for reducing his sentence "[b]eyond what is usual, customary, regular, or common," and reasons "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling Need*, Black's Law Dictionary (11th ed. 2019). Based on the government's concession and the Court's independent assessment, Mr. Staats has presented "extraordinary and compelling reasons" to reduce his sentence.

## B. Mr. Staats is Not a Danger to Others or the Community

The Commission's policy statement, which provides helpful guidance, provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

Mr. Staats is not a danger to the safety of others or to the community under the factors listed in in 18 U.S.C. § 3142(g). Section 3142(g) sets out the factors courts must consider in deciding whether to release a defendant pending trial. These factors weigh both the defendant's possible danger to the community and the defendant's likelihood to appear at trial. Only the former is relevant here. The

factors that weigh danger to the community include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

In May 2018, Mr. Staats pled guilty to one count of receipt of child pornography and one count of possession of child pornography. *Id.* at ¶ 2. The government argues that Mr. Staats is a danger to the community because possession of child pornography is a serious offense that can be committed at home with only an internet connection. Resp. at 20. Because child pornography is often received through the internet in private, the government contends that monitoring Mr. Staats's behavior would be difficult and is made more so by stay-at-home orders brought on by the pandemic. *Id.* at 21. The government also argues that Mr. Staats presents a particular danger because he is planning to return to the same home where he committed the instant offense and has tested positive for COVID-19. Resp. at 20.

A closer look at the history and characteristics of Mr. Staats, his offense, and conduct while incarcerated, reveal that Mr. Staats is not a danger to the community. Mr. Staats had no criminal history prior to his conviction of this

offense. PSR ¶¶ 32-35. He admitted his conduct, cooperated with law enforcement, and pled guilty. *Id.* at 2, 12. He is not violent and has committed no disciplinary infractions while incarcerated. *See* Probation Mem.

Since his arrest, Mr. Staats has been aware of the seriousness of his offense and is "deeply remorseful" for his conduct. Def.'s Sent. Doc. at 10, ECF No. 46. He committed the offense during a difficult period in his life, when he was taking care of his ailing parents and managing suppressed and unaddressed childhood trauma. *Id.* at 9-10. In his psychosexual evaluation, Dr. Christopher Lorah reported that Mr. Staats suffers from post-traumatic stress disorder and has a history of child sexual abuse. *Id.* at 3. Mr. Staats disclosed that he was molested by a Catholic priest on numerous occasions when he was nine and ten-years old. PSR ¶ 58. At the time, he did not report the abuse and was not given any mental health treatment to manage his trauma. Importantly, Dr. Lorah determined that Mr. Staats was at a low-risk for re-offense and low-risk for a contact offense. Def.'s Sent. Doc. at 3.

I find that Mr. Staats will not be a danger to the community during this pandemic because he has a home to return to, where he can self-quarantine, and an adequate reentry plan, as verified by the Probation Office. He will live with his father, sister, and his adult nephew in his father's home in Philadelphia. *See* Probation Mem. His father, who supported him throughout his incarceration, is "willing to help out in any way" with Mr. Staats's reentry needs. *Id.* Mr. Staats will

immediately begin a five-year period of supervised release where his computer will be monitored and he will undergo sex offender and mental health treatment programs. *Id.* He will spend the entire first year under electronic location monitoring until his projected release date of November 27, 2021. *Id.* The stringent conditions of his release mitigate concerns that he will be a danger to the community.

Mr. Staats is 47 years old, has a Bachelor's of Science degree from Temple University, and has a history of gainful employment. PSR ¶ 66; Def.'s Sent. Doc. at 10. Prior to his arrest and conviction, Mr. Staats worked for United Parcel Service, FedEx, and Peapod Delivery services. PSR ¶¶ 69-71. He encountered a stint of unemployment while caring for his sick parents immediately prior to his incarceration. PSR ¶ 68. While incarcerated, he earned his Commercial Driver's License and completed programs in welding and computer skills, therefore increasing his job prospects upon release. *See* Probation Mem. Upon release, he plans to pursue a degree in Information Technologies and obtain a 'Class A' Commercial Driver's License. Def. Mot. at 20.  His education, training, and lack of prior criminal history, are factors that greatly reduce his risk of recidivism and hence any concerns that Mr. Staats could be a danger to the community.[35] Even

---

[35] *Report-At-A-Glance: Recidivism & Federal Sentencing Policy*, United States Sentencing Commission (Mar. 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf (noting that "recidivism rates generally

more, rates of recidivism, especially rates of sexual recidivism, for non-production child pornography offenders—like Mr. Staats—are incredibly low.[36]

The government points to the continuing harm caused to children who appear in child pornography as a factor weighing against compassionate release. *See* Resp. at 19. Indeed, the belief that child pornography continually exploits children and increases demand for children's images, serves as justification for long sentences[37]. I find that the over three years Mr. Staats has already spent in prison is enough to understand the harm caused by child pornography.

Mr. Staats's diagnosis of COVID-19 on October 25, 2020 does not make him a danger to the community today. CDC guidelines indicate that the majority of people who test positive for COVID-19 and remain asymptomatic are no longer contagious after 10 days[38]. Following the 10-day period, the CDC advises that

---

increase as offenders' criminal history calculations increase" and "college graduates were rearrested least often" compared with those with other education levels).

[36] *Federal Child Pornography Offenses*, United States Sentencing Commission (Dec. 2012), https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (finding that rates of sexual recidivism, including a new child pornography offense, is 7.4 percent); *see cf. Report-At-A-Glance: Recidivism & Federal Sentencing Policy, supra* note 35 (reporting from the Sentencing Commission's study of over 25,000 people convicted of a range of federal offenses that the general rate of recidivism is 49.7 percent).

[37] *See Federal Child Pornography Offenses*, *supra* note 38 at 311.

[38] *See When You Can be Around Others After You Had or Likely Had COVID-19*, Centers for Disease Control & Prevention (accessed Nov. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html.

"most people do not require testing to decide when they can be around others."[39]
Because Mr. Staats tested positive nearly a month ago, and has remained
asymptomatic, his previous COVID-19 diagnosis does not make him a threat to the
community.

Including good time credit, Mr. Staats has already served 45 months of a 60-
month sentence. Resp. at 3. His projected release date is a little more than a year
from now on November 27, 2021 and he will become eligible for home
confinement in a few months. Plainly put, the government offers no reason why
Mr. Staats is more likely to be a danger to the community now, than months or a
year from now when he can be placed on home confinement or is scheduled for
release.

 For these reasons, Mr. Staats is not a danger to the safety of others or to the
community under the factors listed in in 18 U.S.C. § 3142(g).

## C. The Section 3553(a) Factors Support a Sentence Reduction

Finally, the Court must "consider[] the [sentencing] factors set forth in
section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A).
Section 3553(a) "contains an overarching provision instructing district courts to
'*impose a sentence sufficient, but not greater than necessary*,' to accomplish the

---

[39] *Id.*

goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)

(emphasis added) (quoting 18 U.S.C. § 3553(a)). These goals include:

> the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner.

18 U.S.C. § 3553(a)(2). The other applicable sentencing factors the Court must

consider are "the nature and circumstances of the offense and the history and

characteristics of the defendant" and "the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of

similar conduct." *Id.* § 3553(a)(1), (6).

The government notes that Mr. Staats received a sentence "that falls well

below the guideline range." Resp. at 24. Importantly, Mr. Staats's sentence

includes not only his term of incarceration, but also his term of supervised release

that follows. *See United States v. Damon*, 933 F.3d 269, 273-74 (3d Cir. 2019)

(explaining that "the word 'sentence' is commonly understood to encompasses

[sic] all penalties imposed on a defendant, which can include penalties beyond

imprisonment," and holding that supervised release is part of the sentence

imposed). Once home, Mr. Staats will serve five years of supervised release under

strict conditions, including a full year of electronic location monitoring. He will be

required to register as a sex offender pursuant to the Sex Offender Registration and Notification Act. In addition, as a result of this offense, Mr. Staats is now a convicted felon subject to a myriad of collateral consequences.[40] Therefore, Mr. Staats's reduced sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.

Mr. Staats's reduced sentence also serves the other goals of sentencing outlined in § 3553(a). The sentence provides adequate deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). As recognized by the National Institute of Justice, "[i]ncreasing the severity of punishment does little to deter crime."[41] There is no reason to think that continuing to incarcerate Mr. Staats, when he is so close to his release date, will protect the public from his further crimes because, as already discussed, Mr. Staats's age, criminal history,[42] education, and instant offense, make him much less likely to recidivate. *See id.* § 3553(a)(2)(C). Moreover, rather than providing medical care, Mr. Staats's continued incarceration might interfere with his ability to get needed medical care. *See id.* § 3553(a)(2)(D). He already has contracted

---

[40] *Collateral Consequences of Conviction Project*, American Bar Association (accessed Nov. 22, 2020), https://www.americanbar.org/groups/criminal_justice/niccc/ (cataloging "over 45,000 federal and state statutes and regulations that impose collateral consequences on persons convicted of crimes").

[41] *National Institute of Justice: Five Things about Deterrence* 1, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

[42] *See Report-At-A-Glance: Recidivism & Federal Sentencing Policy, supra* note 35.

COVID-19 once, a deadly illness that was never intended to be a part of his sentence. To prolong Mr. Staats's incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

"[T]he nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), as discussed in more detail in the previous section, also support a sentence reduction. To reiterate, however, Mr. Staats has no prior criminal history and there are no indications of any violence in his past. He has a perfect disciplinary record in prison. And he is a 47-year-old with serious health conditions that may lead to an increased risk of serious illness from COVID-19.

Finally, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). Because Mr. Staats is just months away from becoming eligible for home confinement, one year away from his release date, and has served the majority of his sentence, granting his motion does not create disparities between him and similarly situated defendants.

The applicable § 3553(a) factors support a sentence reduction for Mr. Staats.

## II.    CONCLUSION

Mr. Staats's sentence was never intended to include a grave risk of severe illness or death from an unforeseen pandemic. For this reason, and the others elaborated here, I will grant Mr. Staats's motion for a sentence reduction. I will sentence him to time served and five years of supervised release with the conditions that he be placed on home confinement and location monitoring until his current projected release date of November 27, 2021. Mr. Staats will also be ordered to self-quarantine in his home for 14 days.


*S/Anita B. Brody*
ANITA B. BRODY, J.

**11-24-2020**


Copies **VIA ECF** on